# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | | |
|---|---|---|
| ST. PAUL FIRE & MARINE INSURANCE COMPANY, | : | |
| | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION NO. |
| v. | : | 1:06-CV-2074-JOF |
| | : | |
| VALLEY FORGE INSURANCE COMPANY, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## OPINION AND ORDER

The instant matter is before the court on Plaintiff St. Paul Fire & Marine Insurance Company's ("St. Paul") Motion for Summary Judgment [85] and Defendant Valley Forge Insurance Company's ("Valley Forge") Motion for Summary Judgment [87] and Motion to Supplement Brief [91].

## I.    Background

### A.    Facts

This is an insurance coverage dispute arising out of a defective construction project at Spelman College. In late 1993, Spelman College signed a general contractor agreement with Russell/Moody, Joint Venture ("Russell") to build the Camille Olivia Hanks Crosby Academic Center ("the Crosby Center"). (Standard Form of Agreement Between Owner

and Contractor, P. Brief Ex. 1). Russell contracted with Mitchell Richards Industries, Inc., d/b/a Logan Masonry Company ("Logan"), in 1994 to perform masonry work, including brick work, concrete masonry, through-wall flashing, masonry wall reinforcing steel, and cast stone installation as a subcontractor on the project. (Subcontract Agreement, P. Brief Ex. 2 at Ex. G). Under the subcontractor agreement, Russell required Logan to have liability insurance and to name Russell as an additional insured on that insurance. (*Id.* at Ex. A). Logan named Russell as the additional insured on its Commercial General Liability ("CGL") policy with Defendant Valley Forge for the policy period from September 21, 1995 to September 21, 1996. (Valley Forge Policy, P. Brief Ex. 20). The per occurrence limit on the policy was $1,000,000. The Valley Forge policy contained a Blanket Additional Insured Endorsement which amended the "WHO IS AN INSURED" section to include as "an insured" "any person or organization whom [the named insured is] required to add as an additional insured on this policy." (Valley Forge Policy, P. Brief Ex. 20 at Ex. 4). The Endorsement also stated: "That person or organization is only an additional insured with respect to liability arising out of a. Premises you own, rent, lease, or occupy or b. 'Your work' for an additional insured by or for you." (*Id.*). The Valley Forge policy covered property damage caused by an "occurrence" that occurred within the policy period. (*Id.* § I(1)(b)). The policy excluded damage to the insured's work itself. (*Id.* § I(2)(l)).

2

Russell also maintained insurance with St. Paul. St. Paul issued Russell policies with a $1,000,000 occurrence limit with coverage starting August 1 from 1995 through 2002. (P. Brief, Ex. 12-19). The St. Paul policy covered property damages caused by the work of a subcontractor. (P. Brief, Ex. 12 at 9-10). The Valley Forge policy and the St. Paul policies contained "Other Insurance," "Excess," and "Methods of Sharing" sections. Logan completed its work on the Crosby Center by January 31, 1996, and a certificate of substantial completion was issued. (Comp. ¶ 14, Ex. 10).

Shortly after Russell and Logan completed the Crosby Center, Spelman began noticing leaks in the building. According to Spelman, the Crosby Center leaked from 1996 "through 2001 and 2002." (Statement of Claim, D. Brief Ex. 12). Spelman had the problems evaluated by an expert, who issued a report on January 23, 2002. (Expert Report, P. Brief, Ex. 5). Spelman sent Russell a copy of the report documenting the defects in the building and the variations from the contract documents in the brick masonry and cast stone facade construction and demanded that Russell fix the problems by replacing the brick masonry and cast stone facade. (Russell Demand Letter, P. Brief, Ex. 6). Russell sent letters along with Spelman's expert reports to Logan on April 10, 2002 and April 18, 2002, demanding that Logan repair the "[i]nadequate and improper brick ties at various locations," and "[i]mproper attachment of cast stone spandrel panels" at its own cost to avoid "a hazard

3

of falling brick and cast stone from the building," and reserving its right to hire someone else to do so should Logan delay. (Logan Demand Letters, P. Brief, Ex. 7-8).

On April 22, 2002, St. Paul tendered Spelman's claim against Russell to Logan. (St. Paul Tender, P. Brief, Ex. 9). The tender explained that Russell was named as an additional insured under Logan's general liability insurance policy, and pursuant to the subcontractor agreement Logan had agreed to indemnify Russell for "all claims against them arising out of [Logan's] work product." (*Id.*).

St. Paul wrote Logan again on September 5, 2002 regarding the claim, instructing Logan to inform its insurers and requesting a response to St. Paul's request for Logan to defend and indemnify Russell with respect to the Crosby Center. (Second St. Paul Tender, P. Brief, Ex. 10). Russell and Valley Forge failed to agree on the necessary repairs, and Spelman ultimately hired another contractor to do the job. The agreement between Russell and Spelman specified that the parties would empanel a Dispute Review Board in accordance with the procedures of the American Arbitration Association to resolve all disputes, claims and other controversies between the parties. (P. Brief, Ex. 1 at 15). As such, on November 3, 2003, Spelman filed a Demand for Arbitration against Russell which stated:

> Subsequent to substantial completion [of the Crosby Center], Spelman noticed that the building leaked and that the building facade showed signs of movement and distress. After a thorough investigation, Spelman determined that [Russell] failed to install the exterior wall/envelope of the building,

4

> including the brick masonry, cast stone facade, and CMU block, among other components, in accordance with the plans, specifications, building codes, and general good building practices. Spelman demanded that [Russell] fix the leaks, correct the deficiencies, and remove and replace the entire brick masonry and cast stone facade systems but [Russell] refused. Spelman demands that [Russell] pay it damages for the costs of repairs, in an amount to be determined at the arbitration hearing, under theories of breach of contract, breach of warranty, negligence, and fraud.

(Arbitration Demand, P. Brief Ex. 3). St. Paul agreed to defend Russell in the arbitration under a reservation of rights on January 6, 2004. (P. Brief, Ex. 24). Russell answered the demand and filed a motion to join Logan and the other subcontractors as third party defendants. (P. Brief, Ex. 27-28). The subcontractors opposed joinder and the parties engaged in litigation in Fulton County Superior Court. Both Russell and Logan tendered the defense of the arbitration demand to Valley Forge. (P. Brief, Ex. 24-25). On February 12, 2004, Valley Forge agreed to defend Logan under a reservation of rights. (P. Brief, Ex. 27). On February 26, 2004, Russell's counsel wrote to Valley Forge requesting a full copy of Logan's policy, defense, and indemnity. (Request, P. Brief, Ex. 22). On April 1, 2004, Valley Forge informed Russell that it had no obligation to defend it. (P. Brief, Ex. 28). Valley Forge's responses to Russell and Logan contained similar reservations of rights; the Russell refusal also contained Valley Forge's understanding of the Russell coverage as "excess" coverage and an explanation that Valley Forge had no duty to defend Russell until it had exhausted its primary coverage.

5

Spelman filed its Statement of Claim in support of its demand on June 28, 2004. (Statement, P. Brief, Ex. 4). This statement supplemented Spelman's demand and outlined the specific deficiencies in the workmanship on the Crosby Center and noted that the leaks had caused damage to other work within the building. (*Id.*). The Statement alleged that the mason's poor workmanship caused damage to the interior work of other subcontractors. (*Id.*). The parties took part in an arbitration. Valley Forge defended Logan under the 1995-1996 Logan policy, but not Russell. St. Paul retained two law firms – Devlin & Robinson and Hawkins & Parnell – to represent Russell. (D. Statement of Facts ¶ 24). Devlin worked for St. Paul from December 2003 until St. Paul removed them in late October or early November 2004. (*Id.* ¶ 26). St. Paul instructed Devlin to stop working and transfer the files to Hawkins. (*Id.*). St. Paul claims it expended $1,032,000.11 in defense costs between June 2003 and December 2005. (P. Brief 11). St. Paul admits that $13,664.50 is arguably duplicate work and demands a total of $1,018,335.61. (*Id.*).

## B. Procedure/Contentions

On August 31, 2006, Plaintiff St. Paul filed a Complaint for Declaratory Judgment demanding (1) a judicial declaration that Valley Forge had an obligation pursuant to the Logan Valley Forge Policy to defend Russell as an additional insured in the arbitration with Spelman; (2) a judicial declaration that Valley Forge must contribute to the cost of defending Russell in the arbitration; and (3) an equitable contribution and reimbursement

6

from Valley Forge for costs St. Paul incurred in providing a defense to Russell. Defendant answered and admitted that Russell was an additional insured on the Valley Forge Policy. Defendant stated that it owed Russell no duties under the policy because it provided only coverage in excess of any other valid and collectible insurance. Defendant defended Plaintiff's complaint in part by stating that St. Paul's claims were barred in whole or in part because they did not constitute an "occurrence" or "property damage" within the meaning of the Valley Forge Policy.

Plaintiff filed the instant Motion for Summary Judgment [85] on April 21, 2008. Plaintiff contends that Valley Forge had a duty to defend Russell in the Spelman arbitration as an additional insured to its policy with Logan. Valley Forge did not defend Russell; as such, Plaintiff avers that it has an independent right to seek contribution from Valley Forge for fifty percent, or $509,167.80, of the $1,018,335.61 in eligible defense costs it paid on behalf of Russell. Plaintiff maintains that the costs to defend Russell should be allocated on an equal basis between it and Defendant pursuant to the "Methods of Sharing" language in both its and Defendant's policies.

Defendant filed its own Motion for Summary Judgment on April 21, 2008 [87]. Defendant maintains that its coverage of Russell as an additional insured is "excess coverage," and as such it had no duty to defend Russell until Russell had exhausted its policy with St. Paul. Even if it were to assume that it had a duty to defend Russell,

AO 72A
(Rev.8/82)

Defendant maintains that there is no cause of action for contribution of defense costs by one insurer against another under Georgia law and the facts of this case. Lastly, Defendant insists that if contribution is permitted, defense costs should be allocated based on a "Defense Follows Indemnity" or a "Time of Risk" theory and Plaintiff should not be able to recover defense costs incurred prior to June 28, 2004, or defense costs which are duplicated or redundant.[1]

## II.     Discussion

This matter presents three issues to the court: (1) whether Valley Forge had a duty to defend Russell; (2) if Valley Forge did have a duty to defend, whether St. Paul has a cause of action for contribution of defense cost; and (3) if St. Paul does have a cause of action for contribution, how much are the recoverable defense costs and how should they be allocated.

### A.     Valley Forge's Duty to Defend Russell

The primary dispute between the parties with respect to duty to defend appears to be whether the Valley Forge policy provided "excess" or primary coverage to Russell. If the policy provided primary coverage then Valley Forge may have a duty to defend. If the policy provided excess coverage, then Valley Forge had no duty to defend until Russell had exhausted its primary coverage with St. Paul. This court will address (1) whether the Valley

---

[1] Defendant filed the instant uncontested Motion to Supplement its brief on April 24, 2008, to correct its calculation of the defense costs incurred by St. Paul on behalf of Russell prior to June 28, 2004 [91]. For good cause shown the court GRANTS Defendant's Motion to Supplement [91].

AO 72A
(Rev.8/82)

Forge policy provided primary coverage to Russell for claims arising out of Logan's work, and (2) whether Russell's tender to Valley Forge gave rise to a duty to defend under the Valley Forge policy.

> i.    *The Valley Forge policy provided primary coverage.*

Valley Forge contends that its policy provided "true excess" or umbrella coverage to Russell. St. Paul contends that Valley Forge's policy merely contained an "excess clause" similar to the one contained in its policy, and that Valley Forge's policy provided Russell with primary coverage. It is important to remember that Valley Forge only insured Russell in 1995 and 1996, and the following discussion applies solely to that particular policy.

In order to understand the parties' arguments it is necessary to parse the differences between an excess or umbrella insurance policy and a primary insurance policy containing an excess provision or clause. A "true excess" or "umbrella" policy is not intended to provide primary coverage and "expressly provides nothing but excess coverage over and above certain primary coverage." *Am. Casualty Co. v. MAG Mutual Ins. Co.*, 185 Fed. Appx. 921, 927 (11th Cir. 2006). Umbrella polices are "true excess over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or escape clauses," and thus, they need not be exhausted before the other policies apply. *Id.* at 927 (quoting *Atkinson v. Atkinson*, 326 S.E. 2d 206, 214 (1985)). An insurer writes a primary policy with the intention of providing primary coverage; however, the insurer may use an

9

excess clause to avoid double payment when the insured has other insurance. "An 'excess' clause [or provision] 'provides that an insurer will pay a loss only after other available primary insurance is exhausted.'" *Id.* at 925 n.2.

A party may be covered by two regular policies with excess provisions. In such cases, the court cannot readily determine which insurance the insured need exhaust first. Georgia courts have resolved this problem by finding that when "two insurance policies covering the same risk both contain 'other insurance' clauses that cannot be reconciled, those clauses cancel each other out and the insurers share in liability pro rata." *Id.* at 925; *Home v. Great Am. Ins. Co.*, 109 Ga. App. 24 (1964). This "irreconcilable rule" was designed to give effect to the insurers' intent when they wrote the "other insurance" clauses; the intent being to indemnify their insured when a covered loss occurred but to avoid liability for an entire loss when there was double coverage. *Southern Home Ins. v. Willoughby*, 124 Ga. App. 162, 166 (1971). In applying the irreconcilable rule, courts look at (1) whether an insured has "other insurance," and (2) whether the excess clauses in the two policies can be reconciled. A party only has "other insurance" if it has two policies covering the same property, the same interest in the property, against the same risks and in favor of the same party. *Home*, 109 Ga. App. at 29. Concurrent insurance generally also covers the same time period. 22-140 Appleman on Insurance Other Insurance § 140.1. Excess provisions are irreconcilable, regardless of how they are written, if "both policies

10

in question provide that if there be other insurance, each shall be responsible only for excess over any other valid and collectible insurance." *Am. Casualty*, 185 Fed. Appx. at 927. *See also Bradshaw v. St. Paul Fire & Marine Ins. Co.*, 226 F. Supp. 569 (N.D. Ga. 1964) (Morgan, J.) (finding policies mutually repugnant); *State Farm Fire & Casualty Co. v. Holton*, 131 Ga. App. 247 (1974) (same); *Willoughby*, 124 Ga. App. at 162 (explaining the rationale between the pro rata rule).

The Eleventh Circuit illustrated Georgia's irreconcilable rule in *American Casualty Company v. MAG Mutual Insurance Company*, 185 Fed. Appx. 921 (11th Cir. 2006) (unpublished). There, Dr. Schlesinger, an optometrist, had a professional liability policy which covered losses arising out of his provision of or failure to provide professional services. The professional liability policy contained an "other insurance" provision which stated that if Dr. Schlesinger had other insurance which applied to a loss, the other insurance must pay first. The practice to which Dr. Schlesinger belonged also had a professional liability policy covering claims arising out of the provision of professional services. The policy itself had an "other insurance" provision. The policy also had a Blanket Employee Shared Limits Endorsement which extended to coverage to medical professionals working for the practice for claims arising in the course of their employment. The Endorsement had its own "other insurance" provision which stated that its coverage was in excess over other valid professional liability coverage which specifically names the individual employee.

11

A patient filed suit against Dr. Schlesinger and the practice, and a state court entered a judgment against both jointly and severally. During the litigation, American Casualty, which issued the doctor's individual policy, defended him and paid the costs of his defense. It also satisfied the judgment. MAG, which issued the practice's policy, defended it. American Casualty sued MAG for contribution for the judgment and Dr. Schlesinger's defense costs. The Eleventh Circuit was faced with the same issues relevant to this case. The court found that (1) the Endorsement constituted a primary policy with an excess clause; (2) the "other insurance" clause in the Endorsement and in the American Casualty policy canceled each other out under *Willoughby* and *Holton*; (3) liability should be distributed pro rata; and (4) because MAG offered no response to American Casualty's argument that it was entitled to equal proration of defense costs, American Casualty could recover defense costs.

Here, the court finds that the Valley Forge policy is a primary policy with an excess provision. The bulk of the Valley Forge policy reads as follows:

**4. Other Insurance.**
If other valid and collectible insurance is available to the insured for a loss we cover under Coverages A or B of this Coverage Part, our obligations are limited as follows:
  **a. Primary Insurance**
  This insurance is primary except when b. below applies.
  If this insurance is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with all that other insurance by the method described in c. below.
  **b.     Excess Insurance**
  This insurance is excess over any of the other insurance, whether primary, excess, contingent or any other basis:

12

(1) That is Fire, Extended Coverage, Builder's Risk, Installation Risk or similar coverage for "your work;"

(2) That is Fire Insurance for premises rented to you; or

(3) If the loss arises out of the maintenance or use of aircraft, "autos" or watercraft to the extent not subject to Exclusion g. of Coverage A (Section I). . . .

(Valley Forge Policy, P. Brief, Ex. 20). The parties do not dispute that the bulk of the Valley Forge policy is intended to provide primary coverage. Defendant argues, instead, that the Endorsement transforms the Valley Forge policy into excess insurance for an additional insured. The "Blanket Additional Insured Endorsement" endorses as insured "any person or organization (called additional insured) who [Logan is] required to add as an additional insured on [its] policy." (*Id.*) The Endorsement goes on to state, "[a]ny coverage provided hereunder shall be excess over any other valid and collectible Insurance available to the additional Insured whether primary, excess, contingent or on any other basis unless a contract specifically requires that this insurance be primary or you request that it apply on a primary basis." (*Id.*).

The court finds that the Endorsement does not transform the primary nature of the Valley Forge policy. It is undisputed that the main Valley Forge policy is a primary CGL policy. The "Blanket Additional Insured Endorsement" merely modifies who is insured under the main policy and extends the primary coverage of the CGL policy to all "additional insured," including Russell. The Endorsement then lays out the specific ways in which it is limiting the main policy. None of these limitations modifies the policy's status as a

13

primary policy.  The Endorsement then seeks to limit Valley Forge's coverage in instances where the additional insured has "other valid and collectible Insurance."  The Endorsement is therefore a quintessential primary policy with an excess clause.  *See Ohio Cas. Ins. Co. v. Oak Builders, Inc.*, 373 Ill. App. 3d 997, 1002 (2007) (interpreting the same language found in the endorsement as an excess provision within primary policies); *Perniciaro v. Liberty Mutual Ins. Co.*, 2002 La. App. LEXIS 1769, **4 (2002) (same).

The parties do not dispute that the St. Paul policy is a primary policy with an excess provision.  It reads as follows:

> ### Other Insurance
> This agreement is primary insurance.  If there is any other valid and collectible insurance for injury or damage covered by this agreement, the following applies:
> **Other primary insurance.**  When there is other primary insurance, we'll share any damages with that insurance using one of the methods of sharing described in the Methods of Sharing section.
> However, we'll apply this agreement as excess insurance over any part of any other insurance which provides:
> - property or similar coverage for property damage to your work;
> - coverage for property damage to premises you rent, lease or borrow from others; or
> - coverage for bodily injury or property damage that results from the maintenance, use, operation or loading or unloading of any auto, aircraft or watercraft that's not specifically excluded by the Auto, Aircraft or Watercraft exclusions.
>
> We explain how we'll apply this agreement as excess insurance in the Excess insurance section.

(P. Brief, Ex. 12).  The court is faced with two primary policies with excess provisions.

Therefore, the court must determine if the irreconcilable rule applies.

The St. Paul policy and the Valley Forge policy are both CGL policies which protect Russell from risks arising out of Logan's work. Defendant argues, however, that the irreconcilable rule should not apply because the policies are not concurrent, or the St. Paul policy does not trigger the "other insurance" clause in the Valley Forge policy, and vice versa. Defendant's concurrent argument is based on the fact that the Valley Forge and St. Paul policies are only partially overlapping from September 21, 1995 to September 21, 1996.

> Under general insurance law,
>
> "Other insurance" refers only to two or more concurrent policies, which insure the same risk and the same interest, for the benefit of the same person, during the same period. . . . "[O]ther insurance" clauses are not intended to allocate liability among successive insurers because they do not insure the same risk and would unjustly make consecutive insurers liable for damages occurring outside their policy periods.

*Allocation Among Insurers*, 23-145 Appleman on Insurance <u>Allocation Among Insurers</u> § 145.4. The court finds the "concurrent" argument to be unpersuasive. Both the 1995-1996 St. Paul policy and the Valley Forge policy insured Russell against losses arising out of Logan's work from September 1995 through August 1996. Logan completed its work on the Crosby Center by January 31, 1996. Valley Forge had a duty to defend if any of the damages resulting from Logan's work arguably triggered its policy. There is no partial duty to defend. *Elan Pharmaceutical Research Corp. v. Employers Ins. of Wausau*, 144 F.3d 1372, 1375 (11th Cir. 1998) (noting that an insurer may have a duty to defend parts of the

15

case they would not have to indemnify). An insurer cannot refuse to defend part of a claim because it believes property damage covered under its policy may also trigger another policy in a subsequent policy period. Thus, it is irrelevant to the court for purposes of the above argument whether Valley Forge and St. Paul held "concurrent" policies during the *entire* period in which the relevant damages might have triggered coverage. Having determined that the St. Paul and Valley Forge policies are concurrent, the only remaining question is whether their excess clauses can be reconciled. Having read and compared the language of the St. Paul excess clause and the excess language in the Endorsement and the bulk of the Valley Forge policy, this court finds that they cannot be reconciled. Under Georgia law, they cancel each other out and both policies act as primary coverage.

### ii. *Valley Forge had a duty to defend.*

An insurer's duty to defend under a primary policy is determined by comparing the allegations of the complaint, or in this case the allegations of the arbitration demand, and the facts supporting those allegations against the provisions of the insurance contract. *Elan Pharmaceutical Research Corp.*, 144 F.3d at 1375; *Penn-America Ins. Co. v. Disabled American Veterans, Inc.*, 268 Ga. 564, 565 (1997). "[A]n insurer must provide a defense against any complaint that, if successful, might potentially or arguably fall within the policy's coverage." *Elan*, 144 F.3d at 1375. Any doubt as to the insurer's duty to defend should be resolved in favor of the insured. *Penn-America*, 268 Ga. at 565. The burden is

16

on the insurer seeking contribution to prove that it is entitled to recover. *Arrow Exterminators Inc. v. Zurich Am. Ins. Co.*, 136 F. Supp.2d 1340, 1351-52 (N.D. Ga. 2001) (Thrash, J.).

Valley Forge indicated by letter on January 31, 2005, that it would "provide a defense to Russell/Moody, as an additional insured, once Russell/Moody's primary policies [were] exhausted." (P. Brief, Ex. 36). As stated above, Valley Forge's policy provided primary coverage to Russell, and Defendant cannot use "excess" as a ground to deny a defense. Valley Forge argues that its letter to Russell also included reservation of rights language, and thus "excess" was not its sole basis for refusing to defend. However, the reservation language in Valley Forge's letter to Russell was virtually identical to the language in Valley Forge's communications agreeing to defend Logan. It appears that the difference in Defendant's treatment of Logan and Russell arose solely from Defendant's belief that its coverage of Russell was excess. By agreeing to defend Logan under a reservation of rights, Valley Forge indicated that it believed that Spelman's claim, if successful, might potentially or arguably fall within the policy's range. Russell requested a defense as to the exact same claim. Except as limited in a contract, an additional insured is entitled to the same protection as a named insured. *Carolina Casualty Ins. Co. v. Underwriters Ins. Co.*, 569 F.2d 304, 314 (5th Cir. 1978). The court finds that Valley Forge had a duty to defend Russell because (1) its decision to defend Logan under the Valley Forge policy indicates that

17

it believed that Spelman's allegations arguably fell within the policy, and (2) its "excess" argument was not a valid ground on which to deny a defense.

## B. St. Paul's Right to Seek Contribution from Valley Forge

The court has determined that Defendant had a duty to defend Russell in the Spelman arbitration; Defendant did not do so. Plaintiff now seeks to be reimbursed for the cost of Russell's defense. This court must determine whether contribution for defense costs is permitted under Georgia law and the facts of this case. Neither the Eleventh Circuit nor the Georgia Supreme Court has explicitly addressed contribution in the context of defense costs, and there is a split in authority generally, with some courts and states allowing an action for contribution and others not. *See* 22-136 Appleman on Insurance Duty to Defend When There are Multiple Insurers § 136.10. The court draws its analysis of this issue from two conflicting opinions out of this district and the general law of Georgia regarding the right to contribution.

As stated above, Georgia case law generally finds that where there are two concurrent primary insurance policies, the insurers should share the losses according to their respective pro rata clauses. *Willoughby*, 124 Ga. App. at 166 (finding that both policies afforded primary coverage (and duty to defend) which should be apportioned according to their respective pro rata clauses); *Home v. Great American Ins. Co.*, 109 Ga. App. at 30 (adjusting based on pro rata policies); *State Farm Fire & Casualty Co. v. Horton*, 131 Ga. App. at 248-

18

49 (finding that insurer who paid judgment was entitled to pro rata contribution from other insurer with policy covering the same loss).

In 1983, the court addressed contribution for defense costs in *Barton & Ludwig, Inc. v. Fidelity & Deposit Co.*, 570 F. Supp. 1470 (N.D. Ga. 1983) (Hall, J.). There, a woman sued Fidelity when she suffered injuries at a house that Fidelity owned. *Id.* at 1471. Fidelity filed a third-party claim against Barton & Ludwig, the real estate agent and broker retained to market the house. *Id.* Barton requested coverage and a defense from Fidelity's insured, St. Paul. *Id.* St. Paul refused. *Id.* at 1472. Barton had a policy with Hartford; Hartford hired counsel to defend Barton. *Id.* The underlying lawsuit settled; Barton and Hartford filed a claim against St. Paul and Fidelity requesting defense costs incurred by Hartford in the defense of Barton. *Id.* The court noted that the "issue of contribution between insurers as to defense costs ha[d] not been addressed in Georgia." *Id.* The court applied ordinary contract principles and found that (1) Hartford's contract with Barton created a personal duty to defend; (2) when Hartford defended Barton in the underlying action it was doing no more than it was contractually obligated to do; (3) the fact that there may have been other insurance coverage did not relieve Hartford of its obligation to defendant; and (4) Hartford could not "now demand that [St. Paul and Fidelity] contribute to the fulfillment of its own contractual obligation, absent a specific contractual agreement to that effect." *Id.* (citing *Argonaut Ins. Co. v. Maryland Cas. Co.*, 372 So. 2d 960 (Fla. App. 1979); *Sloan Constr. Co.*

19

*v. C. Nat. Ins. Co.*, 269 S.C. 183 (1977)). *See also Continental Casualty Co. v. Synalloy Corp.*, 667 F. Supp. 1563 (S.D. Ga. 1986) (Edenfield, J.) (relying on *Barton*). Neither *Barton* nor the cases it relied on referenced any type of "other insurance" language.

In 2006, the court decided *Graphic Arts. Mut. Ins. Co. v. Essex Ins. Co.*, 465 F. Supp. 2d 1290, 1297 (N.D. Ga. 2006) (Batten, J.), and distinguished *Barton*. In *Graphic Arts*, a tenant sued her apartment complex and its management company following an injury. *Id.* at 1292. The apartment complex had a CGL policy with the defendant Essex which named "any organization acting as [the complex's] real estate manager" as an additional insured. *Id.* The management company had its own insurance with the plaintiff Graphic Arts. *Id.* Both relevant insurance policies contained "other insurance" provisions which stated: "If all the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first." *Id.* at 1297-98. The two insurance companies entered into discussion about how to split the defense, but they could not come to a resolution. *Id.* at 1293. The parties wanted to proceed to mediation, so the insurers agreed to a 50/50 split on the indemnity with a reservation of rights. *Id.* The matter settled and the insurers contributed equally to the settlement; however, Graphic Arts did not contribute any money toward the $186,689.96 in defense costs. *Id.* The insurers engaged in a secondary litigation to resolve the allocation of costs; Essex sought

reimbursement of half of the defense costs. *Id.* Graphic Arts relied upon *Barton* to argue that Essex was not entitled to contribution for the defense of its own insured. *Id.* 1297.

The court found that *Barton* was inapposite because "the 'other insurance' clause contained in both policies, specifically the 'method of sharing' subsection, constitute[d] a sufficient contractual arrangement to allow Essex to seek contribution from Graphic Arts." *Id.* The court cited *Nationwide Mut. Ins. Co. v. State Farm Mut. Auto Ins. Co.*, 122 N.C. App. 449, 454-55 (1996) (insurer had right of contribution for defense costs against co-insurer stemming from language in "other insurance" clause), and *Liberty Mut. Ins. Co. v. U.S. Fid. & Guar. Ins. Co.*, 756 F. Supp. 953, 957 (S.D. Miss. 1990) (insurer could recover one-half of defense costs expended from co-insurer that refused to defend pursuant to "equal shares" language in policy). *Id.*

Here, the court finds the holdings of the Georgia courts with respect to contribution in indemnity to be the greatest predictors of Georgia law regarding the right to contribution for defense costs. The court recognizes that the duty to defend is separate from the duty to indemnify, *Elan*, 144 F.3d at 1375; however, the court finds that the principles of equity that underlie the rule of contribution with respect to the ultimate loss apply equally to the costs to defend. Absent a right to contribution, an insurer has no incentive to perform its duty to defend when it knows that the insured has another primary insurer. The non-performing insurer may simply wait out an insured without suffering any consequences, as the insured

21

is unlikely to face a breach of contract suit from an insured whose needs are ultimately met by another party. Defendant offers no persuasive reason not to apply Georgia contribution law to contribution for defense costs. Defendant attempts to argue against the application of the above Georgia case law by pointing to the fact that the "other insurance" provisions, in the matters above and in the instant case, discussing pro rata contribution use the words "damages" or "losses" and do not explicitly refer to apportioning defense costs. This court finds that the use of "damages" or "losses" is broad enough to encompass defense costs and rejects this argument. Defendant likewise argues that the above cases do not apply because its policy is not "concurrent" with Plaintiff's policy. The court rejected this argument as explained above. The court finds that under Georgia law, St. Paul has a cause of action for contribution of defense costs from Valley Forge.

### C.    Amount and Allocation of Defense Costs

Having determined that Valley Forge had a duty to defend Russell and that St. Paul has a cause of action for contribution of defense costs, the court must now determine what portion of Russell's defense costs St. Paul may recover.

AO 72A
(Rev.8/82)

### i.    Recoverable Defense Costs

Defendant contends that even if Plaintiff can recover some defense costs, it cannot seek contribution for any defense costs prior to June 28, 2004, or any duplicate defense costs in November 2004.  Defendant avers that Plaintiff may not recover any costs prior to June 28, 2004, because prior to that time Russell had not alleged arguably covered "property damage" due to an "occurrence."   Plaintiff contends that although Defendant was not explicitly informed that there was covered damage until June 28, 2004, the "true facts" known or ascertainable to the Defendant indicated a covered claim prior to June 28, 2004. The Valley Forge policy covered all non-excluded "property damage" that was caused by an "occurrence" and "occur[red] during the policy period."  (Valley Forge Policy, P. Brief, Ex. 20 at § I(1)(b)).  An "'occurrence' means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."  (*Id*. § V(12)).  "'Property damage' means:  a. Physical injury to tangible property.  . . .  All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or b. Loss of use of tangible property that is not physically injured.  All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it."  (*Id*. § V(15)).  There has been no "occurrence" where faulty workmanship only causes damage to the work itself and not to other property. *Custom Planning & Dev. Inc. v. Am. Nat. Fire Ins. Co.*, 270 Ga. App. 8, 10 (2004).  *See also McDonald Constr. Co. Inc. v. Bituminous Cas. Corp.*, 279 Ga. App. 757, 761-62 (2006).

23

On June 28, 2004, Spelman's Statement of Claim specifically alleged damage to other property, including ceiling tiles, office furniture, and personal property of Spelman employees.  (P. Brief, Ex. 4).  Prior to that date all of Russell's communications with Plaintiff only explicitly mentioned damage to the Crosby Center itself.  Prior to June 28, 2004, St. Paul provided Valley Forge with the expert report and Valley Forge received Spelman's November arbitration demand.  The arbitration demand mentioned leaks and movement and distress in the building's facade; it did not discuss damage to property other than the building.  (P. Brief, Ex. 3).  The LawGibb report references "[n]umerous areas of efflorescence staining on the surface of the masonry . . . indicat[ing] a significant amount of water [was] entering behind the masonry and into the wall cavity."  (P. Brief, Ex 5).

Under *Colonial Oil Indus. v. Underwriters Subscribing to Policy No. T031504607 and TO31504671*, 268 Ga. 561, 562 (1997), if a complaint on its face shows no coverage, but the insured notifies the insurer of factual contentions that would place the claim within the policy coverage, an insurer must conduct a reasonable investigation into its insured's contentions and base its decision upon "true facts."  The court finds that Valley Forge should have and likely did suspect damage to "other property" after learning about the large amount of water within the walls of the Crosby Center.  The fact that Defendant proceeded to represent Logan on the basis of these same complaints supports such a conclusion.  The court finds that the defense costs prior to June 28, 2004 are recoverable.

Defendant also contends that a portion of St. Paul's defense costs were unreasonable. Defendant maintains that Plaintiff cannot seek contribution for the costs of duplicate work in November 2004 when Plaintiff employed two law firms to assist with Russell's arbitration. (D. Brief 24). Defendant contends that the duplicate costs for November 2004 are $13,743.57. (*Id.*). Plaintiff does not contest this notion in its response to Defendant's motion for summary judgment. This court finds that Defendant cannot recover these duplicate costs.

### ii. Allocation Mechanism

The parties have advanced three possible allocation methods, equal basis, "defense follows indemnity," and "time on the risk." Under equal basis, St. Paul and Valley Forge would split Russell's defense costs 50/50. Under the "defense follows indemnity" approach Valley Forge would contribute the same portion of Russell's defense costs as it contributed to Russell's indemnity or to the damage award. Total damages paid to settle the Spelman claim were $2,825,000; the arbitrators concluded that the damages attributable to Logan's work at the Crosby Center were $175,000. Thus, Logan's alleged defective work represented 6.2% of the total damages, and Valley Forge would pay 6.2% of Russell's allowable defense costs. *See Garamendi v. Golden Ins. Co.*, 2005 WL 1899409, *8 (Cal. App. 1st Dist. 2005) (unreported decision) (illustrating "defense follows indemnity" approach). Under the "time on the risk" approach, one-eighth of the total defense costs

would be allocated to each of the eight policy periods, 1995 to 2003. Year one of eight, 1995-1996, was the only year in which Russell was covered by both St. Paul and Valley Forge. The two insurers would divide that year's allocation equally using the "other insurance" language in the policies for that year. Therefore, Valley Forge would ultimately be responsible for one-sixteenth of the total defense costs. *See Gulf Chemical & Metallurgical Corp. v. Associated Metals & Minerals Corp.*, 1 F.3d 365, 372 (5th Cir. 1993) (illustrating the time of risk approach).

The method of allocation between insurers must be determined by the provisions of the contracts they have made. *Home*, 109 Ga. App. at 30 ("[t]he rights of the insurers amongst themselves must be determined not by adjustment of equity *but by the provisions of the contracts made*."). The 1995-1996 St. Paul policy states in relevant part:

> **Excess insurance.** When this agreement is excess insurance, we'll have no duty to defend any claim or suit. However, we'll defend a claim or suit for covered injury or damage if the other insurers won't. In return we'll require that the protected persons give us all their rights against those insurers. Also, we'll pay only the amount of damages that's in excess of:
> * the total amount that all such other insurance would pay if this agreement didn't exist; and
> * the total of all deductible and self-insured amounts under all such insurance.
>
> However, we'll share such excess damages with any other insurance that:
> * isn't described in the Other primary insurance section; and
> * wasn't bought specifically to apply in excess of the limits of coverage shown in the Coverage Summary.
>
> But we won't pay more than the limits of coverage that apply under this agreement.

26

**Methods of sharing**. We'll use one of the methods of sharing described below.

*Contribution by equal shares*. If all of the other insurance permits contribution by equal shares, we'll share the damages equally. But we won't pay more than the limits of coverage that apply under this agreement. If any policy reaches its limit before the entire amount of damages is paid, the remaining policies will share the balance equally until their limits have been used up or the amount of the damages is paid in full.

. . . .

*Contribution by limits*. If any of the other insurance doesn't permit contribution by equal shares, we'll pay that portion of the damages which is equal to our percentage of the total of all limits that apply. But we won't pay more than the limits of coverage that apply under this agreement . . . .

(1995-96 St. Paul Policy, P. Brief, Ex 12 at 15 -16). The Valley Forge policy states in relevant part:

> **b. Excess Insurance**
>
> . . . .
>
> When this insurance is excess, we will have no duty under Coverage A or B to defend any claim or "suit" that any other insurer has a duty to defend. If no other insurer defends, we will undertake to do so, but we will be entitled to the insured's rights against all those other insurers. When this insurance is excess over other insurance, we will pay only our share of the amount of loss, if any, that exceeds the sum of:
>
> (1) The total amount that all such other insurance would pay for the loss in the absence of this insurance; and
>
> (2) The total of all deductible and self-insured amounts under all that other insurance.
>
> We will share the remaining loss, if any, with any other insurance that is not described in this Excess insurance provision and was not bought specifically to apply in excess of the Limits of Insurance shown in the Declarations of this Coverage Part.
>
> **c. Method of Sharing**
>
> If all of the other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal

> amounts until it has paid its applicable limit of insurance or none of the loss remains, whichever comes first.
>
> If any of the other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its applicable limit of insurance to the total applicable limits of insurance of all insurers.

(Valley Forge Policy, P. Brief, Ex. 20 § IV(4)). This language warrants equal allocation. *McDaniels v. Great Atlantic & Pacific Co.*, 602 F.2d 78, 83 (5th Cir. 1979).

Defendant offers three arguments against equal allocation. First, Defendant contends that the method of sharing language in the Valley Forge policy does not apply because it conflicts with the language in the policy endorsement. *See B.L. Ivey Constr. Co. v. Pilot Fire & Cas. Co.*, 295 F. Supp. 840, 848 (N.D. Ga. 1968) (Edenfield, J.) (if there is a conflict between policy and endorsement, endorsement is later expression of intent). This argument is unpersuasive; the court finds that the language in the endorsement supplements rather than conflicts with the method of sharing language. Defendant also argues that the Method of Sharing language should not apply because it does not explicitly mention defense costs and because the St. Paul and Valley Forge policies are not concurrent "other insurance." The court has already rejected these arguments. The court will allocate total defense costs equally.

## III.    Conclusion

The court finds that Defendant had a duty to defend Russell with respect to the instant litigation. The court finds that Defendant did not do so and that under Georgia law, Plaintiff

**28**

may bring a cause of action for contribution. The court will allocate the defense costs equally among the parties in accordance with the methods of sharing language in both agreements. The court finds that Plaintiff cannot recover for the duplicate legal fees paid in November 2004. Plaintiff's Motion for Summary Judgment [85] is GRANTED. Defendant's Motion for Summary Judgment is DENIED [87]. For purposes of clarity, the court DIRECTS Plaintiff to submit a document outlining the defense costs it has incurred and may recover under this order within ten (10) calendar days. The court grants Defendant ten (10) calendar days to respond with any objections. The court will issue an order regarding specific reimbursement on the basis of these pleadings.

IT IS SO ORDERED this 23rd day of March, 2009.


s/ J. Owen Forrester
J. OWEN FORRESTER
SENIOR UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)